LAW OFFICES

# Oscar S. Rodriguez, LLC

4500 LE JEUNE ROAD
CORAL GABLES, FLORIDA 33146
TELEPHONE: (305) 445-2000
FAX (305) 445-9007

September 1, 2021

**BY ECF**

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
The Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Re:   *United States v. Juan Carlos Balaguera Villamizar*
      Case No.: 1:21CR00292-001

Dear Judge Rakoff:

The defendant, Juan Carlos Balaguera Villamizar, through undersigned counsel, respectfully submits this letter memorandum in aid of sentencing, currently scheduled for September 9, 2021.

## Introduction

Juan Carlos Balaguera Villamizar is a fifty-six (56) year old gentleman facing sentencing as a first-time offender for criminal conduct for which he has fully accepted responsibility. Mr. Balaguera has pled guilty to a one-count Information charging him with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(3)(B), in violation of 18 U.S.C. § 1956(h). The advisory United States Sentencing Guidelines imprisonment range is 30 to 37 months, as set forth in the written plea agreement and Presentence Investigation Report ("PSR"). Pursuant to the written plea agreement, either party may seek a sentence outside of the Stipulated Guidelines Range ("variance") based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a).

Mr. Balaguera respectfully submits that based on the factors set forth in 18 U.S.C. §

1

3553(a) the Court should grant a downward variance from the above stated guideline range. Mr. Balaguera is a first-time offender who has committed a nonviolent offense. Mr. Balaguera's personal characteristics and attributes make it unlikely that he will reoffend and support a high probability that he will be rehabilitated without the need for a term of incarceration in the Federal prison system.

The Probation Officer has submitted a sentencing recommendation wherein she recommends a downward variance to 366 days imprisonment. After analysis of the § 3553(a) factors and consideration of other grounds which support a downward variance, Mr. Balaguera requests that the Court impose a sentence below that recommended by the Probation Officer, to that of "time served," as it will be sufficient, but not greater than necessary as mandated by 18 U.S.C. § 3553.

I.   Analysis of the 18 U.S.C. § 3553(a) Factors

The Supreme Court released the district courts from the mandatory Sentencing Guidelines in *United States v. Booker*, 543 U.S. 220 (2005). In the wake of *Booker*, it is essential that district courts make an "individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). In determining a reasonable sentence, the Guidelines range is just a starting point and only one of many factors for the district judge to consider. *See Id.* at 49. To that end the Guidelines should not be presumed to be reasonable. *Id.*

Following the Supreme Court's decision in *Booker*, sentencing courts should engage in a three-step approach to federal sentencing. First, the court should apply the sentencing guidelines to establish the sentencing guideline range. Second, the court should determine whether a departure is consistent with the guidelines. Third, the Court should determine whether a variance, a sentence outside the advisory guideline system, is warranted under the authority of 18 U.S.C. § 3553(a).

Section 3553(a) of Title 18 outlines factors for the district courts to consider when making an assessment and imposing a sentence. Those factors include:

(A) The nature and circumstance of the offense and the history and characteristics of the defendant;

(B) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(C) to afford adequate deterrence to criminal conduct;

(D) to protect the public from further crimes of the defendant; and

(E) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

### A. The Nature of the Offense

The first factor under §3553(a) supports the requested sentence. In the instant case, the offense of conviction was *non-violent*. Federal Courts have consistently held that the *non-violent* nature of an offense should be given consideration and weight during sentencing under § 3553(a). *See e.g., United States v. Davis*, 458 F. 3d 505, 511-12 (6th Cir. 2006) (recognizing that the nonviolent nature of the defendant's criminal acts is a proper consideration under § 3553(a)); *United States v. Sharpe*, 2008 U.S. LEXIS 7927 (E.D. Penn. Feb. 1, 2008) (indicating that the nonviolent nature of the crime committed was a factor the court should consider in crafting a reasonable sentence); *United States v. Ferguson*, 456 F.3d 660, 663-64 (6th Cir. 2006) (noting that the offenses for which the defendant pled were nonviolent in nature, and considering this in the §3553(a) analysis).

**Offense Conduct** Here, the defendant is one of several individuals who participated in a scheme to launder what they believed to be criminal proceeds (proceeds of corruption and graft by Brazilian public officials) using various methods. One of the individuals who had the money laundering and money transmission service was Jose Morely Chocron. He agreed to lend his services to aid in the concealment of funds represented to be proceeds of foreign bribery. He had multiple interactions with two separate confidential sources (CS-1 and CS-2) and an undercover agent (UC) (PSR ¶ 13). These interactions took place during May to October 2019 and involved the laundering of approximately $315,000[1]. Another individual, who represented himself to be a business partner of Chocron in the laundering of illicit proceeds, was Isaac Schachtel. Schachtel explained his laundering network overlapped with the one operated by Chocron. (PSR ¶ 48-49)

Beginning in May 2019, CS-1, CS-2, and two undercover agents (UC-1 and UC-2) provided Chocron and Isaac Schachtel with hundreds of thousands of dollars that they represented were the proceeds of bribe payments to Brazilian public officials, and which the defendants agreed to launder (PSR ¶ 12-58). At various different times, Juan Marcos Matos Ruiz, Alfredo Lichoa and the defendant became involved. Chocron, Schachtel and Lichoa are charged in Case No. 1:20-cr-00400-JSR; Matos Ruiz is charged in Case No. 1:21-cr-00330-JSR-5; and, Mr. Balaguera is the sole defendant charged in the instant case.

As for Mr. Balaguera, he and his wife travel to the United States a few times a year during which he would buy merchandise for resale (for a profit) in Colombia. In this regard, he needed Colombian pesos exchanged for U.S. dollars and Mr. Balaguera's initial transaction with Chocron was to obtain $10,000 USD in the United States[2]. When Mr. Balaguera met with Chocron in the

---

[1] These multiple interactions were prior to Chocron introducing Mr. Balaguera into the offense.
[2] Chocron had a money transmitting business. See page 5 of Government's sentencing letter, filed under D.E. 65.

3

OSCAR S. RODRIGUEZ, LLC

U.S. in order to receive the $10,000, Chocron introduced Mr. Balaguera to UC-1 who said he had money to launder. Mr. Balaguera advised he agreed to receive $10,000; however, when he met with UC-1 on October 10, 2019, UC-1 gave him a bag containing $250,000. When he attempted to decline $240,000, Mr. Balaguera was told to take it all; and, to give $240,000 to another individual. Mr. Balaguera agreed and accepted the offer to launder $240,000 in order to make a commission. On January 24, 2020, UC-1 met with Mr. Balaguera at which time UC-1 provided an additional $150,000.

Mr. Balaguera totally and unequivocally accepts responsibility for his criminal conduct. He knowingly received a total of $400,000 to transfer and/or launder for UC-1 and separately indicted co-conspirator, Jose Morely Chocron. Notably, it was the government UC who dictated the amount of funds, not Mr. Balaguera. In this regard, the UC provided $50,000 to Alfredo Lichoa (D.E. 55, Government's sentencing letter); approximately $100,000 to Juan Marcos Matos Ruiz (Complaint at page 17, D.E. 1) and $400,000 to this defendant.

**History and Characteristics of the Defendant**

The offense was out of character for Mr. Balaguera. He was not a money launderer. He would not have become involved in the instant offense but for this FBI "sting." His initial meeting with Chocron was supposed to be a money exchange (which was not illegal) – Colombian pesos for U.S. dollars. He admittedly let greed guide his decision making when offered the opportunity to earn a commission on laundering $240,000, then an additional $150,000. He totally accepts responsibility for his poor decision-making and assures this Court he will not become involved again.

Mr. Balaguera was arrested March 9, 2020. He was the first defendant to come in and cooperate with the government. He should be awarded credit for his willingness to go above and beyond just pleading guilty (for which the standard three-level reduction for acceptance of responsibility, pursuant to § 3E1.1 of the sentencing guidelines, is granted by the court). A defendant's assistance to authorities in the investigation of criminal activities has been recognized in practice and by statute as a mitigating sentencing factor. Mr. Balaguera's cooperation also demonstrates his positive character and his attempt to make amends for his misconduct. See also, *United States v. Robinson*, 741 F.3d 588, 599 (5th Cir. 2014) [A] sentencing court has the power to consider a defendant's cooperation under § 3553(a), irrespective of whether the Government files a §5K1.1 motion.

Mr. Balaguera is a life-long resident of Colombia and Venezuela. His father passed away in 2005 and had worked for a shoe company. He maintains a close relationship with his mother, age 77. She is a homemaker who worked as a seamstress. Mr. Balaguera had a significant role in her health care prior to his arrest. Subsequent to his arrest, Mr. Balaguera's siblings became

involved in their mother's health care; however, he remains concerned for her wellbeing and has been unable to visit her since he was arrested in March 2020 (correcting PSR at paragraph 91 regarding his parents).

Mr. Balaguera is married to Francyney Nieto Becerra with whom he has a 14-year-old daughter. His wife is a real estate lawyer since 2005. He has two adult children from a previous relationship. Mr. Balaguera has been on house incarceration since his release on bond, and has been unable to travel to see his wife, children, mother and family.

Mr. Balaguera is described as a respectful, moral and exemplary citizen in the letters attached from the Divine Child Jesus Parish, Metropolitan Police of Cucuta and Assistance in Action. He has maintained a positive business relationship with Laurys Tours Travel Agency; his sister Luz Elena Balaguera Hernandez speaks highly of him and remains supportive; he donates food purchased from the El Gran Castillo bakery; he supports St. Jude Childrens' Research Hospital; and, he is otherwise described as being honest, a family man and hard-working member of the Cucuta community (see additional letters of support attached hereto).

Mr. Balaguera maintains a close relationship with his family who remain completely supportive of him. As evidenced by the letters of support, Mr. Balaguera is respected in his community. This solid family and community support system will enable him to easily become a productive member of society when he returns to Cucuta, Colombia.

Importantly, **Mr. Balaguera has no criminal history of any kind**. He is a 56-year-old gentleman who does not have any prior arrests or convictions, placing him not only in criminal history category I, but making him a true first offender with no previous contact with the criminal justice system and zero criminal history points. As such, he is among the category of offenders that present the lowest risk to re-offend. While his placement within criminal history category "I" gives Mr. Balaguera a benefit based on his lack of criminal history, category "I" can be broken down further into classifications with widely varying rates of recidivism: group (a) offenders with no prior arrests; group (b) offenders with prior arrests but no prior convictions; group (c) offenders with prior convictions that are to never count towards criminal history points; and group (d) offenders with one criminal history point. See U.S. Sentencing Commission, Recidivism and the "First Offender", May 2004 and; more recently, Criminal History and Recidivism of Federal Offenders, March 2017. Mr. Balaguera is in group (a), the lowest category of offender. Among these groups the lowest recidivism rate is for group (a) with a rate of 6.8 percent. Group (b) has a recidivism rate of 17.2 percent. Group (c) has a recidivism rate of 8.8 percent. From both culpability and recidivism risk perspectives, group (a) offenders, with no prior arrests, most strongly meet the conceptual definition of the first offender category. Offenders in group (a) have had no recorded contact with the criminal justice system prior to their instant federal offense. Moreover, as indicated by their extremely low recidivism rate of 6.8 percent, they are easily the

most empirically identifiable group of guideline federal offenders who are the least likely to re-offend.

Mr. Balaguera has a lower recidivism rate than most of his fellow federal offenders for several other factors, including his age and the nature of his offense. In December 2017, the U.S. Sentencing Commission published the results of its in-depth research and study, The Effects of Aging on Recidivism Among Federal Offenders. According to Part 5, the reconviction rate is lowest for offenders between the ages of 55 and 59 (9%).

Based on these facts, it is unlikely this defendant will ever become involved in criminal activity again.

C.    **Deterrence, Punishment and Rehabilitation**

Mr. Balaguera likewise asserts that given his age, background, the nature of the offense at issue, principles of punishment, deterrence, and rehabilitation support the sentence that he seeks. Mr. Balaguera has never lived in the United States and he has no plans on continuing to reside here. A term of supervised release may provide that Mr. Balaguera voluntarily departs the United States and does not reenter the United States without the prior written permission of the Secretary of Homeland Security. If he returns to the United States, he must report to the nearest U.S. Probation Office within 72 hours of his arrival.

D.    **The Sentences Available**

This Court is free to impose any sentence it deems appropriate and fair. The bottom of the advisory sentencing guidelines range is 30 months. The U.S. Probation Officer is recommending a term of imprisonment of 366 days. The defendant respectfully requests a sentence of "time served" as more fully explained as follows.

The defendant has served 46 days (March 9, 2020 to and including April 23, 2020). Upon release on bond in this case, Mr. Balaguera has been in **"home incarceration"** with location monitoring and with the limited ability to leave his residence. (See Docket Entries 40 and 51) All told, Mr. Balaguera has been incarcerated or in home incarceration *for almost 16 months*. He has no ties to the United States. He has no friends or family in the United States. He rents a bedroom that is described as a room constructed by a wood division and a curtain and does not have a door (PSR ¶ 102). He was released on bond to home incarceration due to the severe COVID situation at the federal facility in New York.

While time spent in "home incarceration" while "released" on bail is not "official detention" within the meaning of 18 U.S.C. § 3585(b), Mr. Balaguera was released under an

"official" order that significantly curtailed his liberty. According to the Southern District of Florida's U.S. Probation Office's website, "The Location Monitoring Program will provide a safe and cost effective community based *alternative to detention/incarceration* that minimize community risk, and reasonably assures the defendant's appearance at all court proceedings through intensive supervision and accountability." "The persons under location monitoring are confined to their residence, linked to an electronic monitoring system, and required to maintain a strict daily activity schedule. These court-imposed restrictions, combined with close supervision by a probation officer, help deter further crime, ensure the safety of the community, and bring order to the defendant or offender's life." **"Home incarceration calls for 24-hour-a-day "lockdown" at home, except for medical appointments, court appearances, and other activities that the court specifically approves."** (Emphasis added) (https://www.flsp.uscourts.gov/forms/LocationMonitoring.pdf)

While home incarceration is not ordinarily a substitute for confinement, the defendant respectfully asks this Court to consider a downward variance to take into account this time served in home incarceration during these extraordinary times.

F.   **The Need to Avoid Unwarranted Sentencing Disparities**

This factor is important. Here, the government determined the amounts and provided the funds to be laundered by the defendant and his separately indicted co-conspirators. In this case, Mr. Balaguera is considered a third-party money launderer; i.e., he was not involved in the underlying offense from which the funds derived. In this regard, the UC provided $50,000 to Alfredo Lichoa; approximately $100,000 to Juan Marcos Matos Ruiz; and, $400,000 to the defendant. In the government's sentencing letter (D.E.65), it is indicated that "Chocron himself was responsible for the laundering of more than half a million dollars . . ." The value of the laundered funds is a significant factor that drives the sentence for third-party money launderers. This "value-based" adjustment is located in § 2B1.1(b)(1), which provides a table of escalating offense-level increases based upon the value of the laundered funds. By providing significantly different amounts to the third-party money launderers, the government created different sentencing scenarios for people who basically did the same thing. Mr. Lichoa's value-based increase was 6 levels; he was sentenced to 3 months imprisonment (and Mr. Lichoa kept the $50,000[3]). Based on the criminal complaint, Mr. Matos' increase would be 8 levels; he is scheduled for sentencing September 17, 2021. Mr. Balaguera's increase was 12 levels. The main launderer, Chocron, was held responsible for more than $550,000, resulting in a 14-level increase. He was sentenced to 9 months imprisonment with no supervised release to follow. The Court should take this into consideration in order to avoid sentencing disparity between defendants who did basically the same thing.

---

[3] See page 2 of Government's sentencing letter filed under D.E. 55 wherein it states, "Ultimately, the funds were not used to purchase a racehorse, but were not returned to either undercover agent."

7

Oscar S. Rodriguez, LLC

## **CONCLUSION**

The Court should use its discretion to fashion a total sentence that would adequately take into account all of the factors set forth in 18 U.S.C. §3553. The 366-day (12-month and a day) period recommended by the probation officer has been more than satisfied by the amount of time Mr. Balaguera has spent in house incarceration.

For all of the above reasons, the defendant respectfully requests a "time served" sentence because it adequately takes into account all of the above factors and because it is sufficient, but not greater than necessary, to achieve the goals of sentencing.

>Respectfully submitted,
>OSCAR S. RODRIGUEZ
>
>*/s/ Oscar S. Rodriguez*